RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0266p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ASHLEY BARD, individually and as the Administrator
of the Estate on behalf of Zachary Ryan Goldson,
                    *Plaintiff-Appellant*,

        *v.*                                                              No. 19-3468

BROWN COUNTY, OHIO et al.,
                    *Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:15-cv-00643—Susan J. Dlott, District Judge.

Argued:  April 28, 2020

Decided and Filed:  August 18, 2020

Before:  SILER, MOORE, and NALBANDIAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  John Joseph Helbling, THE HELBLING LAW FIRM, L.L.C., Cincinnati, Ohio, for Appellant.  Angelica M. Jarmusz, FISHEL DOWNEY ALBRECHT & RIEPENHOFF LLP, New Albany, Ohio, for Appellees.  **ON BRIEF:**  John Joseph Helbling, THE HELBLING LAW FIRM, L.L.C., Cincinnati, Ohio, for Appellant.  Angelica M. Jarmusz, Daniel T. Downey, FISHEL DOWNEY ALBRECHT & RIEPENHOFF LLP, New Albany, Ohio, for Appellees.

        MOORE, J., delivered the opinion of the court with regard to the excessive-force claim against Defendants Dunning and Schadle, in which SILER, J., joined.  MOORE, J., delivered the lead opinion as to all other issues.  SILER, J. (pp. 33–35), delivered the opinion of the court with respect to Defendants Huff and Wedmore, in which NALBANDIAN, J., joined.  NALBANDIAN, J., (pp. 36–47), delivered the opinion of the court with regard to the scope of the appeal (Part I), in which SILER, J. joined; Parts II, III, and IV of Judge Nalbandian's opinion represent his dissent from Judge Moore's majority opinion.

_____

## OPINION

_____

KAREN NELSON MOORE, Circuit Judge.  On October 5, 2013, Zachary Goldson died in a Brown County, Ohio jail cell.  Less than an hour after a correctional officer was captured on video yelling in Goldson's ear, "I'd like to break your fucking neck right now," multiple correctional officers apparently discovered Goldson hanging by his neck from a bedsheet tied to the sprinkler escutcheon in his cell, in what the officers now characterize as a suicide.  Goldson's sister Ashley Bard, suing the officers and Brown County, Ohio, individually and on behalf of Goldson's estate, disputes this account, claiming that Goldson's hanging was staged.  Bard also brought an array of claims alleging other civil-rights and state-law violations.  In assessing the defendants' motion for summary judgment, the district court acknowledged that there was a genuine dispute of fact as to whether Goldson was capable of hanging himself, mainly due to the physical layout of the cell and Goldson's physical characteristics.  Despite this, the district court granted summary judgment to the defendants, reasoning that Bard had not adduced sufficient evidence as to a specific theory of how Goldson died, and dismissed nearly all of Bard's other claims as well.  For the following reasons, we **REVERSE** in part, **AFFIRM** in part, and **REMAND** for trial on the use of force involved in Goldson's death in the jail cell.[1]  Separately, I would remand for trial on the use of force involved in removing Goldson from a sheriff's cruiser prior to his death.

## I.  BACKGROUND[2]

### A.  Goldson's Booking, Hospital Visits, and Assault of Deputy Justice

Zachary Goldson was booked into the Brown County Jail on or about September 26, 2013, on charges of having a weapon under disability, possession of a dangerous ordinance, and

---

[1]As to the excessive-force claim against Defendants Dunning and Schadle relating to Goldson's death, this opinion is for the majority of the court.  *See* J. Siler Op. at 33.  I depart from my colleagues on the issues of whether Defendants Huff and Wedmore could be liable for Goldson's death and whether Bard has preserved other claims. *See* J. Siler Op. at 33, 35; J. Nalbandian Op. at 36–40.

[2]The following facts are undisputed unless otherwise noted.

shooting across a roadway. R. 77-2 (Thomas Ackley Aff. ¶ 2) (Page ID #3182). An initial medical and mental health screen of Goldson gave no negative information. *Id.* ¶ 4.

On October 4, Goldson swallowed an ink pen, but stated that he did not intend to harm himself in any way. R. 77-3 (Brian Dutlinger Aff. ¶¶ 6–7) (Page ID #3188–89). He was transported to a local emergency room and then returned to holding cell 15 in the jail with a portion of the pen still in his stomach. *Id.* ¶ 8. That night, Goldson complained of stomach pain, R. 76-1 (Schadle Dep. at 51) (Page ID #3018), so Deputy Travis Justice transported him to Southwest Regional Medical Center for treatment, R. 75-4 (Justice Dep. at 33) (Page ID #2088). Dr. Mark Thornton evaluated Goldson and testified that Goldson was calm and cooperative during his medical evaluation, that Goldson did not pose a threat to himself, and that Thornton did not conduct extensive psychological questioning of Goldson. R. 74-11 (Thornton Dep. at 19, 21) (Page ID #1210, 1212).

In the early morning of October 5, at approximately 2:20 a.m., R. 2 (Am. Compl. ¶ 3) (Page ID #28); R. 74-14 (Prosecutor's Summary at 3) (Page ID #1406), Goldson was discharged from the hospital and Deputy Justice secured him in leg shackles, double-locked handcuffs, and a transport belt for transport back to the jail, R. 74-11 (Thornton Dep. at 22) (Page ID #1213); R. 75-4 (Justice Dep. at 42–43) (Page ID #2097–98). As Deputy Justice was opening the door to his cruiser, Goldson freed or partially freed himself from the restraints, struck Justice in the back of the head, and attempted to remove Justice's firearm from his holster. R. 75-4 (Justice Dep. at 49–52) (Page ID #2104–07). Deputy Justice threw his firearm away, and a physical struggle ensued, in which Goldson hit Justice in the face multiple times. R. 75-4 (Justice Dep. at 53–56) (Page ID #2108–11). At some point before or during the struggle, Goldson had one hand and one leg free. R. 75-1 (Staggs Dep. at 26–27) (Page ID #1888–89).

Medical personnel then assisted Deputy Justice in restraining Goldson, R. 74-11 (Thornton Dep. at 24) (Page ID #1215), and helped Justice keep Goldson on his stomach until law-enforcement officers arrived to secure him in handcuffs and leg shackles. R. 98-1 (Georgetown PD Dashcam at 3:16–3:40). Dashcam video footage from the arriving officers reveals this scene, including audio of Goldson dry-heaving. R. 98-1 (Georgetown PD Dashcam at 3:45–3:52). One officer told Goldson, "Shut up, dude," *id.* at 3:48, and either the same or

another officer asked Goldson, "What's your name, trash?" *Id.* at 4:15. Shortly thereafter, Deputy Ryan Wedmore arrived on the scene, kneeled to the ground, and said in Goldson's ear, "What the fuck is wrong with you, you stupid motherfucker?" *Id.* at 4:48–52. Wedmore then stood up and stated, "I don't give a fuck," "Hope you like prison, bitch," and "I'd like to break your fucking neck right now." *Id.* at 4:54–5:19. As the officers lifted Goldson from the ground and transported him into the backseat of a sheriff's cruiser, Wedmore stated, "That motherfucker is getting a welcome party when we get to the jail." *Id.* at 5:47–5:52.

**B. Goldson's Transport and Placement into the Holding Cell**

Deputy Wedmore transported Goldson to the jail and parked in the jail's sally port at approximately 2:32 a.m. R. 75-6 (Wedmore Dep. at 93) (Page ID #2491); R. 98-1 (Sally Port Video at 0:07). Corporal Jason Huff, CO George Dunning, and CO Zane Schadle were present in the sally port when Wedmore arrived with Goldson in tow. R. 75-6 (Wedmore Dep. at 98) (Page ID #2496). Goldson, who was restrained in leg shackles, a transport belt, and two sets of handcuffs, was lying face down in the backseat of the car with his feet facing the driver's side of the car. R. 75-7 (Huff Dep. at 78) (Page ID #2656). Huff opened the rear, driver's-side door of the cruiser, reached inside, grabbed the lower part of Goldson's body, and pulled him out of the cruiser. R. 98-1 (Sally Port Video at 0:08–0:11). The upper part of Goldson's body fell to the floor. *Id.* at 0:12. The officers lifted Goldson from the ground and walked him from the sally port into cell 15. *Id.* at 0:13–0:19; R. 98-1 (Goldson Placement in Cell ("Hallway Video") at 0:20–0:22); R. 75-5 (Dunning Dep. at 102) (Page ID #2269).

At 2:32 a.m., COs Dunning and Schadle entered cell 15 with Goldson, while Corporal Huff and Deputy Wedmore remained in the hallway. R. 75-5 (Dunning Dep. at 101) (Page ID #2268); R. 75-6 (Wedmore Dep. at 113) (Page ID #2511); R. 98-1 (Hallway Video at 0:20). COs Dunning and Schadle testified that they removed the handcuffs, shackles, and transport belt from Goldson in the cell, R. 76-1 (Schadle Dep. at 84–85) (Page ID #3051–52); R. 75-5 (Dunning Dep. at 104–05) (Page ID #2271–72), whereas Bard claims that Goldson remained handcuffed and leg-shackled while lying down. *See, e.g.*, R. 102-2 (Pl.'s Resp. to Proposed Undisputed Facts ¶ 58) (Page ID #4281); Appellant Br. at 18–19. The officers removed a blanket and Goldson's shoes from the cell, R. 75-5 (Dunning Dep. at 151) (Page ID #2318); R.

76-1 (Schadle Dep. at 89) (Page ID #3056), and at 2:34 a.m., exited the cell, closed its door, and walked away. R. 98-1 (Hallway Video at 1:00–1:05). The security footage is too blurry to reveal what items the officers carried into or out of cell 15, other than COs Dunning and Schadle each carrying one pair of handcuffs as they walked down the hallway after exiting the cell. *See* R. 98-1 (Hallway Video at 0:20, 1:05–1:07).

From the time Goldson arrived at the jail's sally port until the officers exited cell 15, CO Sarah McKinzie observed the video feed from another room. R. 75-8 (McKinzie Dep. at 86, 112, 170–72) (Page ID #2811, 2837, 2895–97). Thus, she was unable to see inside cell 15 while COs Dunning and Schadle were inside of it. R. 75-8 (McKinzie Dep. at 167) (Page ID #2892).

After the officers left Goldson in the cell, over the next several minutes, various officers walked up and down the hallway and stopped outside cell 15 to look inside. R. 75-6 (Wedmore Dep. at 116–17) (Page ID #2514–15); R. 98-1 (Hallway Video at 1:35–3:25). Deputy Wedmore and Corporal Huff left the jail to check on Deputy Justice and pick up his car. R. 75-7 (Huff Dep. at 110) (Page ID #2688); R. 102-2 (Pl.'s Resp. to Proposed Undisputed Facts at 1) (Page ID #4278). Between 2:37 and 2:57 a.m., the security footage does not show anyone walking past cell 15. R. 98-1 (Hallway Video at 3:22–5:45).

## C. Initiation of Medical Care to Goldson

At 2:58 a.m., CO Schadle walked down the hallway toward cell 15, with CO Dunning closely behind him. R. 76-1 (Schadle Dep. at 119–20) (Page ID #3086–87); R. 98-1 (Hallway Video at 5:46). Upon reaching cell 15, CO Schadle looked inside the cell and suddenly stepped back with his hands reaching toward the cell door. R. 98-1 (Hallway Video at 5:51–5:55). COs Schadle and Dunning testified that at this moment, CO Schadle discovered Goldson hanging in the cell. R. 76-1 (Schadle Dep. at 121) (Page ID #3088); R. 75-5 (Dunning Dep. at 182) (Page ID #2349). As CO Schadle unlocked the cell door and rushed into cell 15 with CO Dunning behind him, CO McKinzie, who had been walking behind them, arrived at the threshold of the door and observed what was transpiring inside the cell. R. 98-1 (Hallway Video at 6:03–6:07). CO McKinzie then abruptly turned to run back to the booking room to call the communication

center to request a life squad, and then returned to cell 15.  R. 75-8 (McKinzie Dep. at 190) (Page ID #2915); R. 98-1 (Hallway Video at 6:10–6:14).

The parties disagree as to what occurred inside the cell.  According to the defendants-appellees, CO Schadle grabbed hold of Goldson's hanging body around the waist, while CO Dunning reached up and cut the sheet from which Goldson was hanging by the neck.  R. 75-5 (Dunning Dep. at 185) (Page ID #2352); R. 76-1 (Schadle Dep. at 124) (Page ID #3091).  COs Schadle and Dunning then lowered Goldson to the floor and turned him onto his stomach.  R. 76-1 (Schadle Dep. at 129) (Page ID #3096).  CO Schadle then asked CO Dunning for handcuffs, so Dunning ran out to the hallway, returned after a few seconds with the handcuffs, and placed them on Goldson's hands behind his back.  *Id.* at 130 (Page ID #3097).  CO Schadle then turned Goldson onto his back and began to check for a pulse and perform chest compressions while Goldson was still handcuffed; he did not give Goldson any breaths.  *Id.* at 131–32 (Page ID #3098–99).  Upon CO Schadle's request, CO Dunning retrieved a stethoscope.  *Id.* at 133 (Page ID #3100).  Bard denies that the foregoing events occurred at all, but does not point to any evidence supporting her denials.  R. 102-2 (Pl.'s Resp. to Proposed Undisputed Facts ¶¶ 74–78) (Page ID #4283–84).

Corporal Huff, who had returned to the jail, testified that he saw CO Schadle giving chest compressions to Goldson, but that when he "saw" that Goldson was dead, he told Schadle to stop.  R. 75-7 (Huff Dep. at 125, 130) (Page ID #2703, 2708).  At 3:10 a.m., paramedics arrived on the scene and confirmed that Goldson had no pulse or respirations.  R. 74-17 (Ridner Dep. at 12, 20) (Page ID #1821, 1829).  At approximately 3:17 a.m., the Brown County Sheriff's Office called the Brown County Coroner, Dr. Judith Varnau, to report Goldson's death.  R. 74-15 (Varnau Dep. at 152–53) (Page ID #1585–86); R. 74-14 (Prosecutor's Summary at 11) (Page ID #1414).  Dr. Varnau responded to and surveyed the death scene, including by examining Goldson's body.  R. 74-15 (Varnau Dep. at 153, 168) (Page ID #1586, 1601).

**D. Investigations into Goldson's Death**

The details of various entities' investigations into Goldson's death are recounted in full in the district court's opinion, *see Bard v. Brown County*, No. 1:15-CV-643, 2019 WL 590357, at *5–8 (S.D. Ohio Feb. 13, 2019). We provide the following summaries of these investigations.

**Brown County Coroner.** The Brown County Deputy Coroner, Dr. Judith Varnau, issued an initial certificate of death that did not list a cause or manner of death because she was still investigating the incident. R. 74-15 (Varnau Dep. at 210) (Page ID #1643). Dr. Varnau thereafter submitted a supplementary certificate of death providing that Goldson's death was a homicide by strangulation. *Id.* at 213–14. (Page ID #1643, 1646–47).[3]

**Montgomery County Coroner.** The Montgomery County Deputy Coroner, Dr. Susan Allen (a forensic pathologist), preliminarily concluded that Goldson died of "[h]anging by the neck" and suffered "[a]brasions of the nose, back, left forearm, and ankles." R. 74-4 (Allen Letter) (Page ID #927). Her final report for Montgomery County did not mention "hanging by the neck" because Dr. Varnau had asked the Montgomery County Coroner, Dr. Kent Harshbarger, to ask Dr. Allen to omit this statement. R. 74-2 (Allen Dep. at 32) (Page ID #840); R. 74-15 (Varnau Dep. at 199–200) (Page ID #1633–34). However, all six forensic pathologists in the Montgomery County Coroner's office—including Drs. Allen and Harshbarger—agreed that the Goldson's death was "consistent with a suicide and cause of death hanging" and that the evidence was "inconsistent with a typical strangulation death." R. 74-6 (Coroner Email at 1) (Page ID #980).

**Ohio Bureau of Criminal Investigations ("BCI").** The Ohio Bureau of Criminal Investigations found no evidence that Goldson had experienced an assault or unnecessary force. R. 74-1 (Hornyak Dep. at 67) (Page ID #783). A BCI investigator concluded that the evidence was consistent with a suicide, and that Goldson was not murdered. R. 74-9 (Schuler Dep. at 57) (Page ID #1143).

---

[3]A portion of Dr. Varnau's research relied on the opinions of her investigator, Don Newman. R. 74-15 (Varnau Dep. at 77–78) (Page ID #1510–11). The district court later excluded Newman's opinions from consideration on the defendants-appellees' motion for summary judgment. R. 114 (Dist. Ct. Order at 12–13) (Page ID #4632–33).

**Brown County Grand Jury.** A grand jury of the Court of Common Pleas of Brown County issued a report to that court concluding that Goldson committed suicide. R. 77-6 (Grand Jury Rep. at 6) (Page ID #3199).

**Expert Scott Roder.** Bard's forensic animation expert, Scott Roder, analyzed the feasibility of Goldson having hanged himself in cell 15, including by replicating the physical cell based on measurements that Roder received during a scene visit to the jail. R. 92-1 (Roder Rep. at 11) (Page ID #3898). Roder concluded that Goldson could not have hanged himself in cell 15 without the assistance of someone else. *Id.* at 15 (Page ID #3902).

**Inmate Dustin Downing.** Dustin Downing, a Brown County Jail inmate who was incarcerated in a holding cell down the hall from Goldson, submitted an affidavit in support of Bard's claim. R. 97-10 (Downing Aff. ¶¶ 1–2) (Page ID #4181). Downing stated that Goldson was "hogtied" when the officers placed him in cell 15, *id.* ¶¶ 9–10, 12 (Page ID #4182), and that as Downing was cleaning out cell 15 following Goldson's death, he attempted to see if it was physically possible to hang oneself in cell 15, but that he "couldn't do it with both hands freed," *id.* ¶¶ 22, 24 (Page ID #4182–83).

## E. Procedural History

Bard filed suit on October 2, 2015, against Brown County, Sheriff Wenninger, Deputy Wedmore, Corporal Meyer, Corporal Huff, CO Dunning, CO McKinzie, and CO Schadle, in their individual and official capacities, R. 1 (Compl. at 1–2) (Page ID #1–2), and filed an amended complaint three days later, R. 2 (Am. Compl. at 1) (Page ID #25). Her lawsuit asserted violations of Goldson's rights under the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 and various state-law violations. R. 2 ¶¶ 36–88 (Page ID #33–44).

After discovery concluded, the defendants-appellees moved for summary judgment. R. 77 (Mot. for Summary Judgment ("MSJ") at 1) (Page ID #3127). They also filed objections to several of Bard's exhibits, which the district court sustained in part and overruled in part by written order. R. 114 (Dist. Ct. Order at 1) (Page ID #4621). On February 13, 2019, the district court granted summary judgment to the defendants-appellees on all claims except for Bard's claim of intentional infliction of emotional distress against Deputy Wedmore. *See Bard*, 2019

WL 590357, at *22. Bard voluntarily dismissed this remaining claim with prejudice on April 12, 2019. R. 122 (Stip. Entry of Partial Dismissal) (Page ID #4755). She timely filed a notice of appeal. R. 124 (Notice of Appeal) (Page ID #4758).

## II. DISCUSSION

### A. Standard of Review

"This court reviews de novo the district court's grant of summary judgment." *Garretson v. City of Madison Heights*, 407 F.3d 789, 795 (6th Cir. 2005). "In deciding a motion for summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the non-moving party." *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 591–92 (6th Cir. 2001). In order for the non-movant to defeat a summary-judgment motion, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Circumstantial evidence may be sufficient to carry this burden, but in considering a summary-judgment motion, courts "may . . . inquire into the plausibility of circumstantial evidence." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994). "Whether qualified immunity applies to an official's actions is a question of law that this Court reviews de novo." *Virgili v. Gilbert*, 272 F.3d 391, 392 (6th Cir. 2001).

### B. Waiver/Forfeiture

The defendants-appellees first argue that Bard has waived (1) the argument that CO Schadle and/or CO Dunning left Goldson with a collar or strap around his neck, leading him to strangle himself and (2) all of the claims that she originally alleged, except for the claim relating to Goldson's death. We conclude that Bard has preserved her argument as to how Goldson died.[4] Separately, it is my view that Bard has preserved her claims relating to Goldson's removal from the sheriff's cruiser and the medical care he failed to receive in his cell.

---

[4]The defendants-appellees refer mistakenly to waiver when, in fact, forfeiture is at issue. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted). "Waiver is affirmative and intentional," *Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019), and the defendants-appellees nowhere explain how Bard has *affirmatively* abandoned her claims.

### 1. Bard has preserved her self-strangulation theory

The defendants-appellees assert that Bard waived her specific theory of Goldson's death by raising it for the first time in the district court at the hearing on their summary-judgment motion, but binding Sixth Circuit caselaw forecloses this argument. As we held in *United States v. Huntington National Bank*, 574 F.3d 329 (6th Cir. 2009), "litigants may preserve an argument in the district court by 'rais[ing]' it for the first time at a hearing, even when they neglected to make the argument in a pre-hearing filing." *Id.* at 332 (quoting *United States v. Buckingham*, 433 F.3d 508, 512 (6th Cir. 2006)). For example, in *Wayne County Neighborhood Legal Services v. National Union Fire Insurance Co.*, 971 F.2d 1 (6th Cir. 1992), we addressed the same argument that the defendants-appellees make here and concluded that, despite a plaintiff's lack of preparedness at summary judgment,

> [n]onetheless, the plaintiff did appear and argue against the defendant's motion at the summary judgment hearing. A review of the transcript from that hearing shows that *at a very minimum plaintiff's counsel pointed out the provisions of the insurance contract on which it now bases its argument*. Therefore, we find no merit to the defendant's claim that this argument was waived.

*Id.* at 3 (emphasis added) (footnote omitted). This "general rule"—that "raising an issue for the first time at a district court hearing," unlike at an appellate oral argument, preserves the issue—was fleshed out in *Huntington*, in which we explained that "the litigant not only must identify the issue but also must provide some minimal level of argumentation in support of it." 574 F.3d at 332. Here, Bard unequivocally identified her theory at the district-court hearing and provided argumentation in support of it. *See* R. 127 (Summary Judgment Hr'g Tr. at 51–52, 56–57) (Page ID #4813–14, 4818–19). The defendants-appellees do not argue otherwise. Nor do they argue that Bard's theory of Goldson's death was "fashioned after a district court's unfavorable order." *DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006). Because Bard raised this issue to the district court, she has not forfeited it on appeal.[5]

---

[5]Apart from raising the specific self-strangulation theory at the district-court hearing, Bard's memorandum in opposition to the defendants-appellees' motion for summary judgment stated that "some type of ligature other than the sheet was around [Goldson's] neck *prior* to Defendants Schadle, Dunning and McKinzie re-entering Goldson's cell when they found him in medical distress." R. 102 (Mem. in Opp. to Mot. for Summary Judgment ("Mem. in Opp.") at 9) (Page ID #4252); *see id.* at 18 (Page ID #4261) ("The missing piece of evidence is as to

Nor did Bard contravene our rule that, "to the extent [a party] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment." *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007). Years before summary-judgment briefing, Bard alleged in her Amended Complaint that Goldson did not hang himself, and instead "died as a result of homicidal strangulation." R. 2 (Am. Compl. ¶¶ 24, 48) (Page ID #31, 36). Although Bard did not develop the specific self-strangulation theory until later, she did not "seek[] to expand [her] claims" at the summary-judgment stage—the parameters of her § 1983 claim, which focused on the officers' actions inside cell 15 that led to Goldson's death, were the same at summary judgment as they were when she filed her Amended Complaint. *Cf. Vonderhaar v. Waymire*, 797 F. App'x 981, 990 (6th Cir. 2020) (explaining that the plaintiff could not "expand[]" her claim in opposition to the defendant's summary-judgment motion "to include theories of recovery that bore no resemblance whatsoever to the . . . theory raised in her complaint"). Bard's articulation of this theory—which did not expand her original § 1983 claim or raise a new one—at the summary-judgment stage thus did not "subject defendants to unfair surprise." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005).

In sum, Bard raised the specific theory that she raises on appeal at the district-court hearing, and she raised the more general theory of strangulation throughout this litigation. We therefore reject the defendants-appellees' argument that Bard has waived the self-strangulation theory of Goldson's death.

### 2. Bard has forfeited most, but not all, of her claims

The defendants-appellees next argue that Bard has abandoned her other claims for excessive force, failure to intervene, deliberate indifference to medical needs, municipal liability, negligence, assault and battery, wrongful death, spoliation, and intentional infliction of

---

what, if anything, was left on Mr. Goldson's neck at the time Defendants Schadle and Dunning exited the cell. The circumstantial evidence illustrates that the ligature was most likely a Nylon hobble-strap or dog leash."). It is true that Bard's memorandum did not explicitly assert that Goldson died from "self-asphyxiation due to the accidental tightening of an unidentified strap around his neck." Appellee Br. at 29. But her memorandum repeatedly argued that Goldson was "left" with a leash or collar around his neck, *see* R. 102 (Mem. in Opp. at 18, 20, 30) (Page ID #4261, 4263, 4273), which is the same general theory that Bard asserts on appeal.

emotional distress. *See* Appellee Br. at 30. Although she "recounts some of the facts she originally alleged," the defendants-appellees argue, "she develops no legal argument for reversal of the District Court's Order on those claims." *Id.* at 31.

In my view, this is largely true. With respect to every issue except (1) the abusive "greeting" that Goldson received upon arrival in the jail garage and (2) the deliberate-indifference claim related to medical care for Goldson after the officers apparently discovered his body, Bard "raises the issue in h[er] statement of facts, but does not further develop the issue in the argument section of h[er] brief, nor in h[er] reply brief." *United States v. Smart*, 406 F. App'x 14, 17 n.3 (6th Cir. 2010). She presents no arguments in her opening brief in support of her claims of other violations of the Fourth and Fourteenth Amendments under § 1983 or in support of her state-law claims of negligence, assault and battery, wrongful death, spoliation, and intentional infliction of emotional distress. "Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013).[6]

Bard's assertion in her reply brief that her appeal challenges "*in toto*" the district court's grant of summary judgment cannot retroactively preserve these claims. Reply Br. at 1. In this brief, Bard briefly references "Wedmore's verbal assault of Mr. Goldson at the hospital," *id.* at 7, but she has dismissed with prejudice her claim for intentional infliction of emotional distress against Wedmore, R. 122 (Stip. Entry of Partial Dismissal) (Page ID #4755). She also attempts, in her reply brief, to develop arguments in support of her claim related to the identity of the sprinkler escutcheon, but "an appellant abandons all issues not raised and argued in its initial brief on appeal."[7] *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) (alteration in

---

[6]My colleagues acknowledge that we have never set forth "rigid requirements govern[ing] what constitutes developed argument on appeal," J. Nalbandian Op. at 39, but, confusingly, proceed to misread our decision in *McPherson v. Kelsey*, 125 F.3d 989 (6th Cir. 1997), as establishing such requirements. *McPherson*, according to my colleagues, explained that in order to avoid forfeiture, a party's analysis "must" include "the elements of the claim, evidence that could satisfy those elements for the defendants in the case, and responses to asserted affirmative defenses." J. Nalbandian Op. at 37. Such mandatory language appears nowhere in *McPherson*.

[7]The one reference to this issue in the argument section of Bard's opening brief makes no "effort to develop an argument." *Williamson*, 731 F.3d at 621; *see* Appellant Br. at 20 ("Other factual issues point to collusion on the part of the Defendants/Appellants regarding statements made between Sheriff personnel to the Brown County Coroner regarding the time line, presentation by the BCI Investigator pertaining to the authenticity and chain of custody of the sprinkler escutcheon from the jail cell where Mr. Goldson was found.").

original) (quoting *United States v. Still*, 102 F.3d 118, 122 n.7 (5th Cir. 1996)); *see United States v. Penaloza*, 648 F. App'x 508, 521 n.6 (6th Cir. 2016) ("Cabrera raised for the first time in his reply brief the argument on which he focused before the district court . . . . This argument was forfeited when he did not raise it in his opening brief."). Bard has thus forfeited these claims.

By contrast, in support of the excessive-force and failure-to-intervene claims related to Goldson's removal from the cruiser, Bard argues that "[t]he video footage contains direct evidence clearly showing a 'greeting' of Mr. Goldson by the corrections officers and deputies who abused him."[8] Appellant Br. at 18. She also argues that the defendants-appellees' actions "include the 'welcoming party' located in the Sally Port of the Brown County Jail that greeted Mr. Goldson when he arrived and then ripped Mr. Goldson out of the car by Officer Huff's efforts allowing Goldson to 'free fall' and to land face first on the concrete while being in hand cuffs and leg shackles." Reply Br. at 7. As I see it, Bard has thus preserved her excessive-force and failure-to-intervene claims related to the manner in which Goldson was removed from the cruiser. Similarly, in my view, Bard has not abandoned her deliberate-indifference claim because she develops arguments in support of this claim in her opening brief. *See* Appellant Br. at 26 ("[T]estimony and other evidence indicates that no life-saving methods were being executed on Mr. Goldson when the emergency life squad personnel arrived at 03:10 on October 5, 2013."); *id.* ("Although Defendants indicated they had started CPR on Mr. Goldson – unverifiable by any other sources – the Defendants colluded with each other to stop these efforts *prior* to the arrival of the emergency life squad personnel.").[9]

---

[8]It is true that Bard makes this argument in the context of attempting to establish that the officers had "motive and opportunity" to leave Goldson in a dangerous environment in his cell, *see also* Appellant Br. at 21 ("[T]he evidence reveals that the officers involved acted together to give Mr. Goldson a 'welcoming party' *that entailed leaving him in his cell with leg shackles, hand cuffs, and a collar around his neck*.") (emphasis added), but given that it corresponds to her stand-alone claim that the officers used excessive force and failed to intervene in the cruiser-removal incident, I believe that this statement constitutes developed argumentation. That Bard "focuses" her opening brief on the strangulation claim, J. Nalbandian Op. at 37, does not mean that arguments receiving less focus, like this one, are subject to the severe penalty of forfeiture. We should not ignore Bard's excessive-force claim, which she has consistently raised since the outset of this lawsuit, *see* R. 1 (Compl. ¶ 38) (Page ID #9) ("Defendants have, under color of law, deprived Mr. Goldson of . . . the right to be free from excessive force."), and which the district court comprehensively analyzed as a standalone claim, *see Bard*, 2019 WL 590357, at *12, because it overlaps with the broader theory of Goldson's death.

[9]Bard also states: "What is disturbing is that none of the officers came to the rescue of Mr. Goldson or admonished each other from refraining from their conduct that created the situation resulting in the death of Mr.

For these reasons, we hold that Bard has preserved her § 1983 claims related to Goldson's death. I would further hold that she has preserved her claims relating to Goldson's removal from the sheriff's cruiser and the inadequate medical care he received in his cell, and that Bard has forfeited all other claims on appeal.

## C. Excessive-Force Claim for Goldson's Removal from the Cruiser

Because I believe Bard has preserved her claim related to Goldson's removal from the sheriff's cruiser, I proceed to assess the merits of this claim. The district court held that the jail officers were entitled to qualified immunity for the manner in which Goldson was removed from the cruiser, explaining that Corporal Huff "moved quickly and with force to secure an inmate who minutes earlier had escaped restraints and attacked an officer" and that because he did not use "objectively unreasonable force," the surrounding officers could not be held liable for failing to intervene. *Bard*, 2019 WL 590357, at *12. Additionally, the district court explained that the surrounding officers could not be held liable because Huff "removed Goldson from the cruiser so quickly that the other officers would not have had the opportunity to intervene even if intervention had been required." *Id.* The district court was undoubtedly correct as to the surrounding officers. "Generally speaking, a police officer who fails to act to prevent the use of

---

Goldson." Appellant Br. at 27. Although it appears that the word "rescue" may be unrelated to the medical-care argument, given the context of the sentence and the rest of the surrounding paragraph, which relate to the argument that the officers left Goldson in a situation in which he could strangle himself, I believe that this sentence constitutes another attempt at developing the deliberate-indifference claim more generally.

One need only open Bard's opening brief to pages 26 and 27 to see the error in the my colleagues' characterization of Bard's deliberate-indifference argument as merely "support[ing] her self-strangulation claim." J. Nalbandian Op. at 38. The opinion first states that Bard "explains" that the various statements relating to the officers' avoidance of Goldson's medical emergency are connected only to the strangulation claim. Where does Bard "explain" this? All my colleagues point to is a sentence from the *prior* paragraph—following a discussion of what was left on Goldson's neck when the officers initially exited his cell—that says, "The circumstantial evidence illustrates that the ligature was most likely a Nylon hobble-strap or dog leash." Appellant Br. at 26. Bard's argument that the officers were deliberately indifferent to Goldson's medical need does not begin until five sentences later, in a new paragraph. *See id.* (arguing that "no life-saving methods were being executed on Mr. Goldson when the emergency life squad personnel arrived"). The opinion next states that Bard "immediately follows" her statements about medical indifference with a bolded sentence dealing with the self-strangulation claim. J. Nalbandian Op. at 39. Wrong again. The bolded sentence follows only *one* statement—the one we have acknowledged could be construed as supporting either the strangulation claim or the deliberate-indifference claim, *see supra*—whereas the rest of Bard's statements regarding deliberate indifference appear in a different paragraph. *Compare* Appellant Br. at 26, *with id.* at 27. To say that these statements are "immediately followed" by the bolded sentence, transforming their meaning, is to mischaracterize the setup of Bard's brief. The deliberate-indifference claim may not be the "focus" of Bard's brief, but it is surely not abandoned.

excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). The video of this incident confirms that the other officers did not have the opportunity to prevent any possible harm from occurring, given that the use of force lasted approximately three seconds. R. 98-1 (Sally Port Video at 0:09–0:12).   Accordingly, the district court properly granted summary judgment to the surrounding officers on this claim.

To determine whether Corporal Huff's use of force was excessive and thus in violation of the Fourth Amendment, we must consider "whether [his] actions [we]re objectively reasonable in light of the facts and circumstances confronting [hi]m, without regard to . . . underlying intent or motivation."   *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted).  This analysis considers not only the officer's actions themselves but also "the *effects* of [his] actions."  *Brown v. Chapman*, 814 F.3d 447, 459 (6th Cir. 2016).  In the context of a claim against jail officials, "[a] court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).  Beyond whether Huff violated Goldson's constitutional rights, there is the question of whether Huff is entitled to qualified immunity.  "We analyze claims of qualified immunity using a three-part test, which requires us to determine (1) whether a constitutional right was violated; (2) whether that right was clearly established and one of which a reasonable person would have known; and (3) whether the official's action was objectively unreasonable under the circumstances."  *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008) (citing *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (en banc)).

On the question of whether Corporal Huff's use of force violated Goldson's Fourth Amendment rights, none of the various factors that our caselaw mentions in justifying similar uses of force are present here.  First, Goldson was not unsecured.  It is undisputed that Goldson was handcuffed inside the vehicle, and the defendants-appellees do not argue on appeal that there

was a question as to whether the handcuffs were secured. "[O]nce someone has been restrained with handcuffs, the need for force is near 'nonexistent.'" *Kalvitz v. City of Cleveland*, 763 F. App'x 490, 494 (6th Cir. 2019) (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). *Cf. Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008) ("A reasonable officer on the scene would have believed that the threat posed by Dunn was not contained until Dunn was out of the car and handcuffed."). Indeed, the officers had already "neutralize[d] [the] perceived threat," *id.*, by forcing Goldson to the ground at the hospital; handcuffing him behind his back; securing him in leg shackles and a transport belt; and laying him face-down on the backseat of the sheriff's cruiser. *Cf. Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010) (use of force not excessive when an officer responded to the plaintiff injuring another officer by "us[ing] a takedown technique to remove [the plaintiff] from the vehicle and put[ting] him face-down on the ground").

Second, Goldson had not "refuse[d] the Officers' commands to exit the car." *Dunn*, 549 F.3d at 354; *see Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 156 (6th Cir. 2013) ("Hocker did not comply with the officers' commands to exit the vehicle, and as a result they forcibly removed him from the car."); *Graves v. Bowles*, 419 F. App'x 640, 644 (6th Cir. 2011) (forcible removal from arrestee's car was permissible when arrestee refused to comply with officers' orders); *Burdine v. Sandusky County*, 524 F. App'x 164, 166 (6th Cir. 2013) ("Upon arriving at the jail, Burdine again refused the officers' commands to exit the car."). Third, unlike numerous cases before us in which law-enforcement officers have forcibly removed arrestees from the arrestees' own vehicles, given the unknown, potentially dangerous contents inside, *see, e.g.*, *Blosser v. Gilbert*, 422 F. App'x 453, 458 (6th Cir. 2011); *Dunn*, 549 F.3d at 354; *Graves*, 419 F. App'x at 644, here an officer physically removed an inmate from a *law-enforcement* vehicle in which the inmate had already been secured.

The district court explained that Huff's use of force was justified by the fact that Goldson had recently escaped restraints, *Bard*, 2019 WL 590357, at *12, but the defendants-appellees do not make this argument on appeal. Even if they had, it would be unconvincing. Goldson was not an unknown criminal suspect who may have, for instance, possessed a weapon. *See Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011) ("Green could reasonably believe that Hayden was a

hit-and-run suspect who had refused to stop his vehicle despite a police officer's obvious indication that he should. So Green escalated his use of force."). Goldson was a known, secured inmate, and no record evidence indicates that the officers were uncertain whether he had been effectively restrained in the cruiser. Roughly pulling Goldson by the lower part of his body without securing the upper part of his body was certain to—and, as the video reveals, did—result in the upper part of his body crashing to the ground. Although Goldson did not appear to sustain serious head trauma from this maneuver, the video evidence alone is sufficient to create a genuine dispute of fact as to whether Huff violated Goldson's constitutional right to be free from excessive force. *See Ingram v. City of Columbus*, 185 F.3d 579, 597 (6th Cir. 1999) ("[W]e have held that a plaintiff may allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage.") (citing *Holmes v. City of Massillon*, 78 F.3d 1041, 1048 (6th Cir. 1996)). It is clear, in my view, that Huff employed excessive force in removing Goldson from the vehicle, which satisfies both the excessive-force analysis and the first prong of the qualified-immunity analysis.

The clearly-established prong of the qualified-immunity analysis is straightforwardly satisfied here. As the Supreme Court observed in *Saucier v. Katz*, 533 U.S. 194 (2001), "there is no doubt that *Graham v. Connor* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness." *Id.* at 201–02. At the time of the alleged unconstitutional conduct, the proscription against the excessive use of force was clearly established.

As to the objective reasonableness of the use of force, the fact that both the excessive-force and qualified-immunity analyses involve assessing whether the force was objectively unreasonable does not render the latter assessment "merely duplicative" of the former. *Id.* at 203. Indeed, "[t]he qualified immunity inquiry . . . has a further dimension" that "acknowledge[s] that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* at 205. As discussed above, the only theoretical reason for yanking Goldson out of the vehicle by his lower body, guaranteeing that his upper body would immediately fall to the ground, was that Goldson had recently attempted to escape from the officers. But we have repeatedly rejected this argument when the officer "used [such] force well

*after* securing [the individual] and defusing the situation." *Vance v. Wade*, 546 F.3d 774, 785 (6th Cir. 2008); *see, e.g.*, *Burden v. Carroll*, 108 F. App'x 291, 294 (6th Cir. 2004) ("Because [the plaintiff] alleges that [the officer] [violently shoved him] well after the situation was secured, [the officer] cannot claim that he was reasonably mistaken about the degree of force that was appropriate under those circumstances."); *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) ("[A]s we have previously held, striking a neutralized suspect who is secured by handcuffs is objectively unreasonable."). *Cf. Dorsey v. Barber*, 517 F.3d 389, 399 (6th Cir. 2008) ("[Officer] Begin . . . brandished his firearm to secure compliance only after plaintiffs had disregarded his first two commands. In other words, inasmuch as Begin's first two lawful commands had gone unheeded, he reasonably perceived that a show of force was necessary to secure compliance."). "A reasonable officer would understand that, after compliance is secured and a threat is no longer posed, force should not be employed." *Cole v. City of Dearborn*, 448 F. App'x 571, 576 (6th Cir. 2011). Because there is no indication in the record that Goldson posed a threat to the officers, I believe that the district court erred in concluding that Huff's use of force was objectively reasonable and granting him qualified immunity on this basis.

## D. Excessive-Force Claim for Goldson's Placement in Cell 15 and Death

Next, we address the district court's conclusion that Deputy Wedmore, Corporal Huff, CO Dunning, CO McKinzie, and CO Schadle were entitled to qualified immunity for the claims against them based on Goldson's death. Before reaching the issue of how Goldson died, it should be noted that the district court erroneously concluded that "Plaintiff has not put forth admissible evidence establishing *who caused* Goldson's death and *when* if he did not commit suicide." *Bard*, 2019 WL 590357, at *13. To the contrary, on these two issues, Bard has pointed to direct evidence from the security footage demonstrating that COs Schadle and Dunning were alone with Goldson in his cell from 2:32 to 2:34 a.m., while Corporal Huff and Deputy Wedmore watched from the hallway. R. 98-1 (Hallway Video at 0:20–1:01). The fact that, between COs Schadle and Dunning, Bard does not allege which officer took which action is immaterial at the summary-judgment stage. In *Fazica v. Jordan*, 926 F.3d 283 (6th Cir. 2019), we explained:

> Defendants argue that because Fazica cannot clearly attribute particular uses of force to particular Defendants, she cannot prove that any particular Defendant's conduct violated her constitutional rights. For example, they argue

that she cannot prove whether it was Defendant Officer Fletcher, Cordova, Tucker, or Jordan who was the one to twist her arm behind her back, rip her pants off, touch her genitals, etc., and that therefore she must lose at summary judgment. We reject Defendants' argument and conclude that a reasonable jury could find that each of the named Defendants violated Fazica's clearly established constitutional rights either by directly using excessive force against her or by observing others doing so and failing to act.

*Id.* at 289–90 (record citation omitted); *see also Binay v. Bettendorf*, 601 F.3d 640, 651 (6th Cir. 2010). Even less speculation is necessary here than in *Fazica*, because only two officers were present in the cell (both of whom are identified by name), and Bard's excessive-force claim with respect to Goldson's death rests on only one act—the officers placing a strap or collar around Goldson's neck. Thus, the question for us to consider is not "who?" or "when?" but "how?"[10]

On this question—how did Zachary Goldson die?—there is substantial evidence supporting the defendants-appellees' version of events. The consistent, sworn testimonies of numerous officers present at the jail when Goldson died; the similar conclusions of the Montgomery County Coroner's office's forensic pathologists, a grand jury, and a state criminal investigation; and video evidence revealing the on-duty officers apparently reacting with surprise upon discovering Goldson's body all indicate that Goldson committed suicide by hanging. Furthermore, the defendants-appellees are correct that Investigator Newman's testimony regarding the possible hobble-strap markings on Goldson's body was deemed inadmissible by the district court, *see* R. 114 (Dist. Ct. Order at 12–13) (Page ID #4632–33), and Bard neither appealed that decision nor argued in her appellate brief that it was incorrect, *see* Appellee Br. at 40–41, so Bard's citation to Newman's testimony is improper, *see* Appellant Br. at 11.

---

[10]On this point, the dissent states: "I disagree that defendants Schadle and Dunning's presence alone with Goldson in cell fifteen is enough to conclude they deliberately caused Goldson's death." J. Nalbandian Op. at 40. Yet absent from our analysis, *see infra* Part II.D.1–4, is any intimation that these officers' "presence alone" could lead a reasonable jury to hold them liable, J. Nalbandian Op. at 40. Instead, it is discrete, affirmative evidence, discussed below, that could permit such a finding of liability. Accordingly, we make only a limited point in referencing *Fazica*: If the evidence is sufficient to conclude a victim suffered a constitutional violation caused by a limited universe of actors (as here and in *Fazica*), the plaintiff's claim may survive summary judgment without attributing discrete physical acts to discrete actors, so long as each actor necessarily (1) committed the act or (2) failed to stop it from occurring. *See Fazica*, 926 F.3d at 295 ("A jury could reasonably conclude that when an officer commits such acts, his colleagues are likely to notice."). In reality, the dissent does not contest our understanding of *Fazica*, but only our underlying reason for turning to it: There is sufficient evidence in this case, as in *Fazica*, to conclude that the victim suffered a constitutional violation at the hands of an identifiable group of law-enforcement officers.

In our view, however, the district court erred in concluding that Bard "does not have evidence sufficient to establish that any Defendant used excessive force or failed to intervene to prevent the use of excessive force against Goldson, much less that any specific Defendant caused Goldson's death." *Bard*, 2019 WL 590357, at *13. For the following reasons, we conclude that (1) the genuine dispute of fact as to whether Goldson physically could have hanged himself, (2) the testimony of the Brown County Coroner, Dr. Judith Varnau, (3) the dispute over whether Goldson was leg shackled, and (4) Deputy Wedmore's threatening comments to Goldson shortly before the latter's death create a genuine dispute of material fact regarding how Goldson died.

### 1. Dispute over feasibility of hanging

The existence of a factual dispute over whether Goldson could have physically hanged himself is without question. Indeed, nowhere in the defendants-appellees' brief do they argue that Bard has failed to demonstrate a genuine dispute on this issue, and as the district court concluded, "Plaintiff does establish a question of fact as to whether Goldson physically could have hung himself in holding cell 15 by tying a sheet around the sprinkler assembly." *Bard*, 2019 WL 590357, at *12. This finding is plainly correct given the forensic analysis of Bard's expert, which concluded that Goldson could not have hanged himself, the affidavit of Dustin Downing (despite any indication that it lacks trustworthiness, *see id.* at *7 n.8), the testimony of Dr. Varnau regarding the implausibility of Goldson hanging himself, *see, e.g.*, R. 74-15 (Varnau Dep. at 224) (Page ID #225), and the evidence of Goldson's finger impairment, R. 97-3 (Booking Finger Prints at 1–2) (Page ID #3949–50).[11] Thus, as all parties seem to agree, a jury could conclude that Goldson was not capable of hanging himself. We need not decide whether this genuine dispute alone would have been sufficient to defeat the defendants-appellees' motion for summary judgment, given the other evidence supporting Bard's opposition to the motion, as follows.

---

[11]This dispute is apparent even without considering the evidence that Goldson remained handcuffed and/or leg-shackled in his cell, *see infra*, which would clearly make it less likely that he could have hanged himself.

### 2. Dr. Varnau's testimony

At the time of Goldson's death, Dr. Varnau was responsible for investigating the mode, manner, and cause of his death, R. 74-15 (Varnau Dep. at 27) (Page ID #1460), and she personally responded to the jail upon notice that Goldson had died, *id.* at 82 (Page ID #1515). Much of her deposition testimony related to her official conclusion that Goldson did not hang himself, and specifically related to the implausibility of a suicide under the circumstances. For example, she said that it "didn't seem to add up" that the officers had carried out CPR on Goldson while the noose was still tied around his neck. *Id.* at 219–20 (Page ID #152–63). She also confirmed that her analysis of Goldson's death was based on her visual inspection of the body, her interviews and conversations with individuals on the death scene, the preliminary findings of the Montgomery County Coroner, the final autopsy of the coroner, the autopsy photographs, her own personal death-scene photographs, and various measurements taken of cell 15. *Id.* at 233–34 (Page ID #1666–67).

Most critical to the issue on appeal are Dr. Varnau's statements during her deposition that support the theory that Goldson's death by strangulation involved a hobble strap around his neck. First, she stated that Officer Don Hency commented on the autopsy photographs that he had knowledge of individuals incarcerated in the jail being "led around by hobble straps in the jail. Put the straps around their necks and they lead them like on dog leashes." *Id.* at 83–84 (Page ID #1516–17).**[12]** Second, she confirmed that her statement that the marks may have been left from a

---

**[12]**Hency's out-of-court statements may constitute inadmissible hearsay, but it is well-established that the party opposing summary judgment need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Instead, a party opposing summary judgment who proffers evidence in a form not admissible at trial "must show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). It is possible that Hency could testify at trial as to this neck-leashing practice, and if he did not have personal knowledge, another individual could lay this foundation.

The dissent argues that introduction of the jail's practice of placing inmates in neck restraints would constitute inadmissible character evidence, but does not specify how this evidence goes to anyone's "character," nor whom it impugns. J. Nalbandian Op. at 43. Federal Rule of Evidence 404(b)(1) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Officer Hency's observation, by contrast, does not pin the neck-leashing practice on any of the named defendants. It is not evidence that a particular named defendant "is the sort of person who would" place an inmate in a neck restraint—"[t]his is precisely the sort of propensity reasoning Rule 404(b) forbids." *Helfrich v. Lakeside Park Police Dep't*, 497 F. App'x 500, 507 (6th Cir.

hobble strap was based on observing photographs of Goldson's body. *Id.* at 253 (Page ID #1686).[13]

Dr. Varnau also testified that, based on her review of the evidence, Goldson's death was a homicide by strangulation. *Id.* at 214 (Page ID #1647). In support of this theory, she compared the marks on Goldson's neck to those of a typical hanging. "When you look at the way that, a person that's hung, there's usually a V here on their neck," Dr. Varnau explained. *Id.* at 222 (Page ID #1655). As for the marks on Goldson's neck, she continued, "it seems that something was pulling him back this way. It was not something that was pulling up." *Id.* at 223 (Page ID #1656). This testimony resembles that of an examining doctor in *Ratcliff v. Daniel*, 224 F.3d 766 (5th Cir. 2000) (unpublished), a summary-judgment appeal before the Fifth Circuit dealing with the same question that we consider here—whether an incarcerated decedent had, in fact, committed suicide by hanging. In *Ratcliff*, the examining doctor "noted that, in a hanging, the ligature mark usually runs in an upward 'V' pattern across the neck, whereas the mark on [the decedent]'s neck was horizontal-as if [he] had been strangled from behind." *Id.* at *2. The Fifth Circuit reversed the district court's grant of summary judgment to the defendants, concluding that the "[t]he testimony of [this doctor and another doctor] certainly produces an issue of material fact as to whether the Appellees negligently failed to protect Ratcliff from harm by others than himself." *Id.* In similar fashion here, Dr. Varnau offered specific testimony in support of the theory that Goldson died by strangulation.

Although the district court did not exclude Dr. Varnau's testimony, at least four aspects of the district court's evaluation of it were either questionable or erroneous. First, and most

---

2012) (emphasis added). Instead, evidence that the jail had a practice of leashing inmates by the neck is more akin to background evidence. "Proper background evidence has a causal, temporal or spatial connection with the charged offense." *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000). "Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense." *Id.* The jail's general practice of leashing inmates—which does not even identify a "prior" specific "act" for Rule 404(b) purposes—would be directly probative of its employees following this practice in the instant case. We reject the proposition that this constitutes inadmissible character evidence.

[13]Elsewhere in her deposition testimony, Dr. Varnau stated that Investigator Newman had reviewed autopsy photographs and concluded that the marks on Goldson's neck "could be like a hobble strap or something like that." *Id.* at 78 (Page ID #1511). As we have already clarified, Newman's testimony was inadmissible, so we do not consider this statement by Varnau as supportive of Bard's opposition to summary judgment.

important, although it is true that Dr. Varnau did not specifically comment on the theory that Goldson died by accidental self-strangulation after struggling against a hobble strap around his neck, the district court's conclusion that Dr. Varnau's testimony "does not reasonably support that theory" is incorrect. *Bard*, 2019 WL 590357, at \*14. Dr. Varnau's testimony supports the general theory that Goldson was strangled to death with a hobble strap; the specific theory of self-strangulation with the hobble strap, placed by the relevant officers, is consistent with—and supported by—the more general theory. A jury could reasonably infer either that one or both of the officers strangled Goldson with a hobble strap or that one or both of them placed Goldson's neck in a hobble strap, which led him to strangle himself after struggling against the restraint.

Second, the district court improperly weighed the credibility of Dr. Varnau's testimony, noting that she "offered inconsistent theories of how [Goldson] died." *See id.* This was in error. "[P]roof that a party . . . has made prior inconsistent statements is not a rare event in our courts. Juries are regularly called upon to consider evidence of that sort, and we all know that prior inconsistency does not inexorably lead to defeat." *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 537 (6th Cir. 2018) (quoting *Norris v. Sysco Corp.*, 191 F.3d 1043, 1049 (9th Cir. 1999)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255; *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) ("In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." (citation omitted)). To the extent the district court rejected Dr. Varnau's testimony because it "offered inconsistent theories" of Goldson's death, this was erroneous.

Third, the district court questioned the significance of Dr. Varnau's testimony because "she did not testify—nor could she testify since she was not present at the jail—as to *which* officer purportedly placed the never-seen hobble strap or ligature around Goldson's neck." *Bard*, 2019 WL 590357, at \*14 (emphasis added). For the reasons discussed above, it was not necessary for Bard to submit evidence regarding which of the two officers placed the strap around Goldson's neck. *See Fazica*, 926 F.3d at 289–90. Nor was Dr. Varnau's testimony any less significant because she did not name a specific officer responsible for Goldson's death.

Fourth, the district court stated that Dr. Varnau's testimony about the hobble strap or leash was "based at least in part on Newman's inadmissible opinion," *Bard*, 2019 WL 590357, at *14, but ignored that Dr. Varnau also stated explicitly that her hobble-strap theory was "base[d] . . . on looking at the photographs," R. 74-15 (Varnau Dep. at 253) (Page ID #1686). Although the district court did not deem Dr. Varnau's testimony inadmissible, any discounting by the district court of this testimony because it was based, in part, on Newman's inadmissible opinion was improper.

On a related note, the dissent would have us extend our evidentiary analysis beyond assessing the district court's rulings—and beyond what any of the parties have argued—and deem Dr. Varnau's cause-of-death testimony wholly inadmissible because she was not at the scene when Goldson died and because she was not qualified as an expert. *See* J. Nalbandian Op. 44–45. We reiterate that the district court never concluded that Dr. Varnau's deposition testimony was inadmissible, nor did the defendants-appellees seek such an evidentiary ruling. At the district court's hearing on the motion for summary judgment, the district court raised the issue of "the legal or factual significance of Dr. Varnau's determination that Mr. Goldson's cause of death was a strangulation or homicide if she was not medically qualified to perform an autopsy," but did not conclude—or even suggest—that Dr. Varnau's testimony would be excluded as inadmissible evidence. R. 127 (Summary Judgment Hr'g Tr. at 3) (Page ID #4765). Moreover, the defendants-appellees have never argued—either in the district court, *see generally* R. 103 (Defs.' Objections at 1–20) (Page ID #4302–21), or on appeal, *see generally* Appellee Br.—that Bard cannot rely in part on Dr. Varnau's deposition testimony to demonstrate a genuine dispute of material fact. Indeed, the defendants-appellees themselves repeatedly cited her testimony in their motion for summary judgment, *see* R. 77 (MSJ at 10–11) (Page ID #3139–40), and they did not ask the district court to exclude Dr. Varnau's testimony during oral argument on the motion. Bard has consistently revealed to the defendants-appellees her reliance on Dr. Varnau's testimony, *see, e.g.*, R. 102 (Mem. in Opp. at 25) (Page ID #4266); R. 102-2 (Pl.'s Resp. to Proposed Undisputed Facts ¶¶ 70, 72, 74–75) (Page ID #4283–84); Appellant Br. at 18 ("It is for a jury to weigh the testimonial evidence of Dr. Judy Varnau, Dr. Susan Allen and Dr. Kent Harshbarger as well as their credibility to understand the official manner and cause of death."), yet the defendants-appellees have never argued that this testimony is inadmissible.

For these reasons, the dissent's proposed, *sua sponte* consideration of whether Dr. Varnau's testimony should have been excluded runs contrary to a fundamental tenet of evidence law: "All evidence is admitted as a matter of course unless a valid ground of objection is interposed." 75 Am. Jur. 2d Trial § 303; *see* 88 C.J.S. Trial § 190 ("A party opposing the admission of evidence has the burden to persuade the judge to exclude it."); *United States v. Gomez*, 67 F.3d 1515, 1525 (10th Cir. 1995) ("Assuming that Mr. Nordfelt's testimony could properly be cast as that of an expert, Mr. Gomez did not object at trial to the admission of the expert testimony and, therefore, the issue is not properly before this court."); *United States v. Presley*, 349 F. App'x 22, 28 (6th Cir. 2009) (finding no Confrontation Clause violation when "defense counsel likely made a strategic decision not to object to the admission of the hearsay testimony by [the government's witness]"). In our adversarial system, "the common law made the parties the captains of their own litigious fate." 21 Wright & Graham, Federal Practice and Procedure: Evidence 2d § 5032.

It is therefore no surprise that all of the cases cited by the dissent for its argument that Dr. Varnau's testimony is wholly inadmissible at trial involved one party objecting to or opposing the admission or consideration of such opinion evidence. *See Harrison v. New York Life Ins. Co.*, 78 F.2d 421, 424 (6th Cir. 1935) ("*Over strenuous objection, and under interrogation by the court itself*, [a physician] was permitted to give an opinion that the causes contributing to the death of the insured were vertigo, nervous exhaustion, and indigestion with eruptions. This evidence was clearly inadmissible.") (emphasis added); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig.*, 227 F. Supp. 3d 452, 457, 463 (D.S.C. 2017) (noting the defendants' "strenuous objections" to the court reopening expert discovery and other objections to evidentiary rulings); *Hall v. Flannery*, 840 F.3d 922, 925, 927–28 (7th Cir. 2016) (holding that, upon the defendant's "immediate[]" objection at trial to the testimony of an expert witness, the trial court should have applied the Rule 702/*Daubert* framework); Appellant Br. at 24 in *Hicks v. Scott*, 958 F.3d 421 (6th Cir. 2020) (opposing consideration of the testimony of a witness who was not present when decedent was shot by law enforcement; "[the witness] was not present when [the decedent] went downstairs to confront the officers and was never in a position to confirm or disconfirm the presence of a rifle pointed at [the law-enforcement officer]"). In stark contrast here, the defendants-appellees have never argued that Dr. Varnau's

cause-of-death testimony should have been excluded.  This is made doubly clear by the fact that the defendants-appellees specifically objected to Bard's "improper use of certain fact witness deposition testimony as opinion testimony"—but Dr. Varnau was not one of these fact witnesses whose testimony the defendants-appellees challenged.  R. 103 (Defs.' Objections at 1) (Page ID #4302); *see id.* at 18 (Page ID #4319).  We decline to consider an evidentiary objection that no party has made, and that the district court never considered.

In sum, the district court erroneously discounted Dr. Varnau's testimony at the summary-judgment stage.  Her testimony contributes to the genuine dispute of fact over whether Goldson strangled himself after the officers left him in a hobble strap.

### 3.  Dispute over whether Goldson was leg-shackled

Further supporting Bard's theory of Goldson's death is the genuine factual dispute over whether Goldson was bound in leg shackles after COs Dunning and Schadle left his cell.  This dispute is material because it is undisputed that Goldson was restrained in leg shackles at the time he *entered* the cell, and Bard argues that the officers left Goldson with "some type of collar around the neck connected to the shackles that tightened as Mr. Goldson struggled thereby causing his asphyxiation. . . . [I]t was by the manner of struggling with the *leg* shackles and neck collar" that led to his death.  Appellant Br. at 19 (emphasis added).[14]  The district court held that Bard had failed to adduce sufficient evidence to contest the officers' testimony that the leg shackles were both (1) taken off of Goldson and (2) removed from the cell.  *Bard*, 2019 WL 590357, at *13.  The defendants-appellees agree, and argue on appeal that "[t]he available evidence establishes that the officers removed the leg shackles from Mr. Goldson prior to exiting the cell," citing COs Dunning's and Schadle's deposition testimony.  Appellee Br. at 43.  The defendants-appellees acknowledge, however, that the "available evidence" on this point is "in the

---

[14]Although the dissent initially faults Bard for "present[ing] no evidence that leg shackles cause asphyxiation," the opinion goes on to acknowledge the potential relevance of leg shackles to this case. J. Nalbandian Op. at 42 ("[I]t's irrelevant whether Goldson's legs were bound *absent* evidence of a restraint around his neck.") (emphasis added).  As the dependent clause of this statement demonstrates, it is the dissent's belief that Bard lacks evidence of a neck restraint that, in its view, makes the leg-shackling issue irrelevant.  But if a neck restraint did exist, the reverse would be true. That is, if Bard *has* adduced evidence of a neck restraint—which we believe she has, *see supra* Part II.D.2—then attaching leg shackles to this restraint could make it more likely that a struggling inmate would strangle himself.

form of sworn deposition testimony"—that is, there is no visual evidence showing the officers removing leg shackles from the cell. *Id.* at 9. This is a critical flaw in the defendants-appellees' argument: The available *visual* evidence, which captures every officer's entry into and exit out of Goldson's cell, shows that Goldson was bound in leg shackles upon entering cell 15, and does not clearly show anyone exiting with the leg shackles, supporting the inference that they stayed strapped onto Goldson's body once the officers left his cell. Hallway Video at 0:56–1:20. In fact, neither CO Dunning's testimony nor CO Schadle's testimony specifically identifies any of the items that they removed into the hallway as leg shackles. *See* Appellee Br. at 43 (citing R. 75-5 (Dunning Dep. at 104–05) (Page ID #2271–72); R. 76-1 (Schadle Dep. at 84–86) (Page ID #3051–53)). The fact that the hallway video does not clearly show the officers removing the leg shackles from the cell supports the conclusion that they remained on Goldson.

Furthermore, CO McKinzie twice clarified in her deposition testimony that she collected Goldson's transport belt and handcuffs—but *not* his leg shackles—for evidence after Goldson was placed in his cell. *See* R. 75-8 (McKinzie Dep. at 113, 138) (Page ID #2838, 2863). It is true that, as the district court explained, CO McKinzie "stated clearly to the BCI that she saw the officers remove the leg shackles from holding cell 15 before locking Goldson in the cell," *Bard*, 2019 WL 590357, at *13, but at the summary-judgment stage, her sworn statements still support the inference that she did not collect the leg shackles because they remained on Goldson's body. The undisputed fact that Goldson entered cell 15 bound in leg shackles, the lack of any dispositive evidence showing that the officers removed these leg shackles from the cell, and CO McKinzie's testimony that she did not collect the leg shackles from the cell support the inference that Goldson remained bound by this item when the officers left his cell. Based on the foregoing evidence, the district court erred in concluding that Bard had provided insufficient evidence to allow a reasonable jury to find that Goldson was restrained in leg shackles when he died.

### 4. Deputy Wedmore's threatening comments

Finally, we note the graphic, threatening nature of Deputy Wedmore's comments to Goldson, which he made less than an hour before Goldson died. Towering over a prone, handcuffed individual and mocking him with statements such as, "What the fuck is wrong with

you, you stupid motherfucker," and "Hope you like prison, bitch," would itself be cause for concern. But Wedmore went beyond verbal humiliation, stating, "[T]hat motherfucker is getting a welcome party when we get back to the jail" and "I'd like to break your fucking neck right now." These comments occurred shortly after 2:20 a.m., R. 2 (Am. Compl. ¶ 3) (Page ID #28); R. 74-14 (Prosecutor's Summary at 3) (Page ID #1406), and by 2:58 a.m., Goldson was dying— or had already died—from a broken neck or a related asphyxiating cause. True, Wedmore was not inside cell 15 with Goldson, but he stood just outside the cell as COs Schadle and Dunning engaged with Goldson outside the view of the security camera. For his part, Wedmore testified, "It was something I said. It wasn't an action I took." R. 75-6 (Wedmore Dep. at 77) (Page ID #2474). Yet particularly with respect to the broken-neck comment, this highly specific threat's temporal proximity to Goldson's death is simply too glaring to ignore at this juncture.

***

Combined with the dispute over whether suicide-by-hanging was physically possible in Goldson's cell, the testimony of the Brown County Coroner, the dispute over whether Goldson was leg shackled, and Deputy Wedmore's threatening comments suffice to create a genuine dispute of fact as to whether Goldson died by self-strangulation. Although no direct evidence supports the theory of self-strangulation by hobble strap, circumstantial evidence would permit a reasonable jury to arrive at this conclusion. *See Hanson*, 736 F. App'x at 539 ("There is no *res ipsa loquitur* principle for constitutional torts, but a jury's evaluation about whether excessive force took place here seems appropriate considering [the plaintiff]'s significant injuries and the record's missing puzzle pieces.").

Relatedly, the district court erred in suggesting that Bard's theory relied on the doctrine of *res ipsa loquitur*.[15] "[R]es ipsa loquitur means that the facts of the occurrence warrant the inference of negligence[;] . . . that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking." *Sweeney v. Erving*, 228 U.S. 233, 240 (1913). But Bard

---

[15]The defendants-appellees' reference to *Clark-Murphy v. Foreback*, 439 F.3d 280, 286 (6th Cir. 2006), is limited to that opinion's reminder that *res ipsa loquitur* does not apply to deliberate-indifference claims, *see* Appellee Br. at 23, 26, 46, 48. Apart from this maxim, *Clark-Murphy*—which focuses on the sufficiency of evidence, at the summary-judgment stage, as to *who* was responsible for a decedent's death—does not shed light on this case, which deals with the sufficiency of evidence regarding *how* the decedent died.

does not argue that the "facts of the occurrence"—Goldson's death in a jail cell—furnish circumstantial evidence that the defendants-appellees were liable. Rather, she points to specific pieces of circumstantial evidence and testimony to support this conclusion: (1) Goldson undisputedly died by either strangulation or hanging; (2) various exhibits and testimony support the theory that suicide-by-hanging was impossible; (3) the marks on Goldson's neck, according to the coroner, were indicative of (a) a hobble strap and (b) strangulation; (4) there is circumstantial video and testimonial evidence that the leg shackles remained on Goldson in the cell; and (5) one of the participating officers had stated shortly before Goldson's death that he'd like to "break [Goldson's] fucking neck." Despite all this, the dissent characterizes our analysis as concluding that a factual dispute exists "simply because Bard says so." J. Nalbandian Op. at 41. Given that none of the preceding evidence stems from declarations by Bard, we cannot comprehend—much less respond to—the dissent's contention.

Whether under the rubric of excessive force or deliberate indifference, this genuine dispute of material fact over the manner of Goldson's death should have kept the district court from granting summary judgment to four of the five defendants-appellees (Schadle, Dunning, Wedmore, and Huff) and concluding that they were entitled to qualified immunity. As to COs Schadle and Dunning, one or both of them strangling Goldson with a hobble strap would subject them both to liability under § 1983. *See Coley v. Lucas County*, 799 F.3d 530, 540 (6th Cir. 2015) ("A chokehold rendering an arrestee unconscious and causing his death constitutes excessive force under Fourth Amendment standards."); *Briggs v. Miles*, No. 15-1386, 2017 WL 2174252, at *3 (6th Cir. Mar. 6, 2017) (order) (district court properly denied qualified immunity when a reasonable jury could find that correctional officers watching another officer choke the plaintiff "had the opportunity and the means to stop this use of force").

Alternatively, if either or both of these officers placed Goldson's neck in a hobble strap, leading him to strangle himself, both could be found deliberately indifferent. A claim of deliberate indifference has both an objective and a subjective component.[16] "For the objective

---

[16]We have not yet issued a published opinion interpreting the effect of *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), on deliberate-indifference claims to conditions of confinement in the pretrial-detainee context. *See Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018). But even if we continued to apply a purely subjective standard

component, the detainee must demonstrate 'the existence of a "sufficiently serious" medical need.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)). "For the subjective component, the detainee must demonstrate that the defendant possessed 'a sufficiently culpable state of mind in denying medical care.'" *Id.* (quoting *Blackmore*, 390 F.3d at 895). A defendant has a sufficiently culpable state of mind if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Asphyxiation is a sufficiently serious medical need, and because resolving the facts in Bard's favor would mean concluding that the officers left him lying on the floor with a hobble strap fastened around his neck, this would permit the conclusion that the officers disregarded an excessive risk to Goldson's safety. In my view, the foregoing analysis applies equally to Deputy Wedmore and Corporal Huff, who observed the actions of COs Schadle and Dunning from the hallway, and could be found liable either for failing to intervene or for deliberate indifference.[17] Finally, the defendants-appellees do not argue that, if Bard's self-strangulation theory were credited and the facts were resolved in her favor, they would be entitled to qualified immunity. *Cf. Lawrence v. Chabot*, 182 F. App'x 442, 451 (6th Cir. 2006) (plaintiff "failed to argue on appeal that any of the alleged constitutional violations were 'clearly established' at the time that defendants acted" and issue was thus waived). Accordingly, we hold that COs Schadle and Dunning are not entitled to qualified immunity in relation to Goldson's death. I would hold further that Deputy Wedmore and Corporal Huff are not entitled to qualified immunity.

As to CO McKinzie, even construing the facts in the light most favorable to Bard, no record evidence indicates that McKinzie was "personally involved" in the strangulation of Goldson. *Binay*, 601 F.3d at 650. The only assertion that Bard makes in her appellate brief with

---

to these claims, *see Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017), the result here would be the same.

[17]My colleague's view of Deputy Wedmore's and Corporal Huff's potential liability controls. *See* J. Siler Op. at 35 ("The evidence indicates that Officers Huff and Wedmore were not in the cell with Goldson."). My colleague's opinion offers no explanation, however, as to why an officer who observed and was capable of preventing a grave constitutional violation would be exempt from liability simply because he did not commit the violation himself. The video footage unmistakably depicts Huff and Wedmore watching what transpired in the cell as they stood mere feet from Goldson, Dunning, and Schadle. If they were subjectively aware of Goldson's plight and ignored it, why would we dismiss them from this case?

respect to CO McKinzie's liability for excessive force or failure to intervene is that McKinzie "acted in conjunction" with the other named officers to leave Goldson in strangulating conditions in his cell. Appellant Br. at 22. For these reasons, summary judgment as to CO McKinzie was proper.

**E. Deliberate-Indifference Claim for Medical Care Rendered to Goldson**

Unlike Bard's excessive-force claim as to Goldson's placement in the cell and the manner in which he died, her assertions regarding the inadequate medical care that her brother received are unsupported even by circumstantial evidence. Bard argues that "testimony and other evidence indicates that no life-saving methods were being executed on Mr. Goldson when the emergency life squad personnel arrived at 03:10 on October 5, 2013," Appellant Br. at 26; that "the Defendants colluded with each other to stop these efforts [CPR] *prior* to the arrival of the emergency life squad personnel," *id.*; and that "none of the officers came to the rescue of Mr. Goldson or admonished each other from refraining from their conduct that created the situation resulting in the death of Mr. Goldson," *id.* at 27. Yet Bard adduces no evidence—direct or circumstantial—to support a theory of collusion, and the video evidence revealing the actions of COs Dunning, McKinzie, and Schadle belies the suggestion that "none of the officers came to [Goldson's] rescue." *Id.* at 27. What remains is the legal question of whether the responding officers were deliberately indifferent for ceasing life-saving methods—at the command of Corporal Huff—prior to the paramedics arriving at 3:10 a.m. But we need not assess whether the officers "intentionally den[ied] or delay[ed] [Goldson]'s access to medical care," per *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1098 (6th Cir. 1992), because regardless, the officers would be entitled to qualified immunity. Bard does not explain how "it would [have] be[en] clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Specifically, she has set forth no argument for why Corporal Huff's conclusion that Goldson was already dead was objectively unreasonable. Accordingly, the district court properly granted qualified immunity to all defendants on this claim.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the grant of summary judgment as to George Dunning and Zane Schadle, and **REMAND** for trial on the liability of these defendants for the death of Zachary Goldson. We **AFFIRM** as to all other defendants-appellees.

---

## OPINION / CONCURRENCE

---

SILER, Circuit Judge, delivering an opinion of the court and concurring.  At issue is: (1) what claims the plaintiff, Ashley Bard, preserved for appeal, and (2) whether she presented sufficient evidence to defeat a motion for summary judgment on those claims.  I agree with Judge Nalbandian that Bard only preserved one issue: whether the district court erred in granting summary judgment on her claim that the defendants used excessive force by restraining Zachary Goldson in his cell in a manner that led to his self-strangulation.  However, I agree with the lead opinion that Bard presented sufficient evidence to defeat a motion for summary judgment on this claim.

First, we must determine what claims Bard preserved for appeal.  "An appellant abandons all issues not raised and argued in its initial brief on appeal." *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) (quoting *United States v. Still*, 102 F.3d 118, 122 n.7 (5th Cir. 1996)).  Additionally, "[i]ssues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013).  Here, Bard's opening brief only addresses the issue of whether the district court incorrectly granted summary judgment with respect to the use of excessive force in relation to Goldson's death by strangulation.  The lead opinion concludes that Bard preserved two additional claims: (1) whether defendants used excessive force against Goldson in the sally port, and (2) whether defendants were deliberately indifferent to Goldson's medical needs. However, Bard's appellate briefs only mention the facts underlying these two issues and only discusses these facts in relation to how Goldson died.  Bard does not cite any cases, provide any analysis, or develop any argument in support of these claims.  Therefore, I agree with Part I of Judge Nalbandian's opinion and conclude that the only claim that the plaintiff preserved for appeal is whether the district court erred in granting summary judgment with respect to her claim that some defendants used excessive force by restraining Goldson in his cell in a manner that led to his self-strangulation.

The remaining issue is whether Bard presented enough evidence to defeat a motion for summary judgment on this claim. The dissent contends that the evidence of what happened in Bard's cell only demonstrates that Officers Dunning and Schadle were in the cell with Goldson and that they removed at least some of his restraints and other items from his cell. The dissent argues that other evidence, such as a dispute as to whether it was physically possible for Goldson to hang himself in his cell and whether Goldson remained leg-shackled in his cell are immaterial. I disagree. These facts are relevant and create disputes of material facts regarding whether Officers Dunning and Schadle used excessive force by restraining Goldson in his cell in a manner that led to his self-strangulation.

The district court acknowledged that there was a genuine dispute of fact as to whether Goldson was capable of hanging himself. Goldson's cause of death was asphyxiation, and the defendants argue that he died by hanging himself. If this was not possible, it is relevant and material to plaintiff's argument that Goldson died in a different manner. Bard alleges that Goldson was left hand-cuffed in his jail cell with leg restraints and a hobble strap around his neck, which led him to strangle himself after struggling against the restraints.

There is evidence in the record in support of this theory. Dr. Varnau, who was responsible for investigating the mode, manner, and cause of death, concluded that Goldson did not hang himself, and she made statements in her deposition that support the theory that Goldson's death involved strangulation by a hobble strap. For example, she discussed how an officer told her that there is a practice at the jail of leading incarcerated individuals around by hobble straps and also that the marks on Goldson's neck indicated they may have been from a hobble strap. The district court did not find that Dr. Varnau's testimony was inadmissible. Although the district court may later decide to strike her testimony, currently it is evidence which should be considered on appeal. Additionally, there is evidence that Goldson entered the cell with leg shackles, on and there is a dispute as to whether he remained bound by them in his cell.

Goldson also died from asphyxiation less than an hour after Deputy Ryan Wedmore told Goldson: "I'd like to break your fucking neck right now." Even if the dissent is correct that this reprehensible statement cannot impute intent and motive to Officers Dunning and Schadle, who

were the only officers with Goldson in his cell before he died, it is at least relevant evidence to be considered.

I agree with the lead opinion that when all this evidence is considered, a jury could reasonably infer either that one or both of Officers Dunning and Schadle placed Goldson's neck in a hobble strap, which led him to strangle himself after struggling against the restraint. The evidence indicates that Officers Huff and Wedmore were not in the cell with Goldson. Therefore, I would **REVERSE** the grant of summary judgment as to Officers Dunning and Schadle, and **REMAND** for trial on the liability of these two defendants for the death of Zachary Goldson. I would **AFFIRM** the district court's grant of summary judgment as to all other defendants and claims.

---------------------

**OPINION / DISSENT**

---------------------

NALBANDIAN, Circuit Judge, concurring in part and dissenting in part.**[1]** Plaintiff Ashley Bard makes the most serious allegation she can against law enforcement officials—that they deliberately or with reckless disregard killed an inmate committed to their custody and then covered it up by lying and manipulating physical evidence. But this allegation, like any, can only survive a motion for summary judgment if it's supported by evidence. Because this one is not, it fails. And because I also find that Bard forfeited all her other claims, I write separately.

I.

The first question we must address is the scope of this appeal—that is, what claims Bard preserved for appeal. Bard contends that she's preserved all of them, Defendants say none of them, and the lead opinion says, essentially, three of them: (1) whether Defendants caused Goldson to strangulate himself, (2) whether Defendants used excessive force against Goldson in the Sally Port, and (3) whether Defendants were deliberately indifferent to Goldson's medical needs. I choose a fourth option—Bard preserved only her self-strangulation claim.**[2]** I agree that, under our precedent, Bard preserved her excessive force claim resulting from Goldson's alleged self-strangulation. *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009). But this is the *only* claim she raises in her opening appellate brief. And as the lead opinion agrees, "[a]n appellant abandons all issues not raised and argued in its initial brief on appeal." *United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) (quoting *United States v. Still*, 102 F.3d 118, 122 n.7 (5th Cir. 1996)). Bard forfeited the rest of her claims, including any claim related to Defendants' treatment of Goldson in the Sally Port and deliberate indifference related to the medical treatment Goldson received.

---

**[1]**Part I of this opinion represents the views of a majority of this panel. Parts II, III, and IV represent the dissenting view of Judge Nalbandian.

**[2]**I concur in the lead opinion's holding that Bard forfeited all claims that this opinion doesn't address and in its ultimate judgment affirming summary judgment for Defendants on Bard's deliberate indifference claim over the medical treatment that Goldson received.

To begin, the argument section of Bard's opening brief contains only one section. Its heading reads:

> No reasonably well-trained officer in Defendants/Appellees' position would have believed that it is an acceptable practice of law enforcement personnel to leave a pretrial detainee in a jail cell leg-shackled, hand cuffed, and with a strap around their neck connected to leg shackles without the possibility of the inmate strangling himself.

(Appellant's Br. at 18.) Taking Bard at her word, she presents only her self-strangulation claim.

And unsurprisingly, Bard's entire opening brief focuses on this claim; that Defendants violated Goldson's Fourth Amendment rights when they used excessive force in allegedly restraining him in a manner that resulted in his strangulation. Just as Bard does for this claim, an appellant who raises an argument on appeal typically does four things: (1) cite facts giving rise to the claim, (2) cite cases establishing the elements of the claim, (3) apply the facts of her case to those elements, and, in cases such as this one when the defendant asserts qualified immunity as a defense, (4) cite cases showing that the alleged violation of federal law was clearly established when it occurred. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (explaining that, at a minimum, the analysis required to avoid forfeiture must contain the elements of the claim, evidence that could satisfy those elements for the defendants in the case, and responses to asserted affirmative defenses); *see also Sioson v. Knights of Columbus*, 303 F.3d 458, 459–60 (2d Cir. 2002) (per curiam) ("To make a legal argument is to advance one's contentions by connecting law to facts[.]"). For Bard's excessive force and failure to intervene claims related to Goldson's removal from the cruiser and her deliberate indifference claim, she at most does only the first of these four things. Indeed, we have gone further and held that an appellant must make "some effort at developed argumentation" to raise a claim on appeal. *McPherson*, 125 F.3d at 995 (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)). Bard does not do that here, except for her self-strangulation claim.

The lead opinion concludes otherwise but I am not convinced. First it points to half a sentence in which Bard says, "[t]he video footage contains direct evidence clearly showing a 'greeting' of Mr. Goldson by the corrections officers and deputies who abused him[.]" *Ante*, at 13. According to the lead opinion, these twenty-two words are "developed argument" for an

excessive force claim.    But Bard explains in the second half of that sentence that the video footage is important because it "indicate[s] motive and opportunity to create a dangerous environment for Mr. Goldson by leaving him shackled and handcuffed in a jail cell with something around his neck that lead [sic] to him being asphyxiated." (Appellant's Br. at 18–19.) What's more, Bard lists the passage cited by the lead opinion as evidence that answers the question: "how did Mr. Goldson die?" (Appellant's Br. at 18.) So it's clear this sentence is a small part of Bard's larger argument that Defendants used excessive force against Goldson by leaving him restrained in a way that contributed to his alleged self-strangulation. That means it's not itself a developed argument for an independent claim. Developed argument requires more than a twenty-two-word half-sentence that fails to mention the claim by name, cite the legal standard, or apply that standard to the facts of the case. *See Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 462 (6th Cir. 2003) (holding that a single sentence in support of a claim in Appellant's brief could not overcome forfeiture), *superseded on other grounds by regulation*, 29 C.F.R. § 2560.503-1(l) (2003), *as recognized in Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879 (6th Cir. 2020); *Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir. 2002) (finding a claim forfeited when the appellant failed to specifically mention the claim and failed to address why the district court's grant of summary judgment on that claim was improper). So Bard forfeited her claims related to Huff's removal of Goldson from the cruiser.

Next, the lead opinion concludes that Bard developed arguments in support of a deliberate indifference claim. *Ante*, at 13–14. And it relies on three sentences in Bard's brief to do so. (*See* Appellant's Br. at 26 ("[T]estimony and other evidence indicates that no life-saving methods were being executed on Mr. Goldson when the emergency life squad personnel arrived at 03:10 on October 5, 2013."); *id.* ("Although Defendants indicated they had started CPR on Mr. Goldson – unverifiable by any other sources – the Defendants colluded with each other to stop these efforts ***prior*** to the arrival of the emergency life squad personnel."); *id.* at 27 ("What is disturbing is that none of the officers came to the rescue of Mr. Goldson or admonished each other from refraining from their conduct that created the situation resulting in the death of Mr. Goldson.").) But again, Bard uses those statements to support her self-strangulation claim—not to make a separate deliberate indifference claim.

Bard explains that these statements provide "circumstantial evidence illustrat[ing] that the ligature [around Goldson's neck] was most likely a Nylon hobble-strap or dog leash." (*Id*. at 26.) Bard also immediately follows these statements with a bolded sentence asserting that the circumstantial evidence leaves a dispute about "who actually strangled Mr. Goldson or who put the wheels in motion that placed Mr. Goldson in the situation resulting in his strangulation[.]" (*Id*. at 27.) These statements clarify that the passages cited by the lead opinion only support Bard's excessive force claim, not an independent deliberate indifference claim. Because Bard failed to cite the standard for deliberate indifference claims and apply that standard to the facts of her case, she also forfeited her deliberate indifference claim. *See McPherson*, 125 F.3d at 995. And the rest of Bard's briefing supports my limited view of the claims Bard develops.

On top of that, just because Bard cites facts consistent with claims she failed to raise doesn't mean that we can fill in the legal arguments for those claims. But that's exactly what the lead opinion would do here. *The lead opinion* supplies all legal arguments in, and cases cited by, its merits analysis of the excessive force claim related to Huff's removal of Goldson from the cruiser and the deliberate indifference claim. And it spends eight pages discussing, and cites twenty-one cases in support of, these claims. Eight pages, and twenty-one cases, more than Bard's briefing does. Our adversarial legal system permits judges only to serve as referees, while "it is up to the parties to spar with each other on each and every issue." *Brenay v. Schartow*, 709 F. App'x 331, 337 (6th Cir. 2017). "If appellate courts roll up their judicial sleeves, scour the record, and develop the relevant arguments and counter-arguments, what is to prevent the parties from submitting a two-page brief stating their legal claims and leaving it to the court to do the rest?" *Id*. But if we reach Bard's additional claims here, that's exactly what we would be doing.

To be sure, I am not saying that rigid requirements govern what constitutes developed argument on appeal. But neither is the standard infinitely malleable. Here, the district court rejected both claims on the merits as part of a comprehensive written opinion. Now, on appeal, Bard cites no cases in response, applies no law to any facts related to these claims, and doesn't even cite or discuss the trial court's rejection of those claims.

Our precedent is clear. Because Bard's opening brief develops argument in support of only one claim—that Defendants used excessive force by restraining Goldson in a manner that allegedly led to self-strangulation—Bard forfeited all other claims. *See Johnson*, 440 F.3d at 845–46. Thus, we affirm the district court's grant of summary judgment to Defendants on all Bard's other claims.

## II.

Bard concedes she must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." (Appellant's Br. at 16 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).) Because she presents no affirmative evidence that Defendants placed anything around Goldson's neck, Bard has not satisfied her burden of establishing a dispute about whether Defendants caused Goldson's death.

To begin, I disagree that Defendants Schadle and Dunning's presence alone with Goldson in cell fifteen is enough to conclude they deliberately caused Goldson's death. *Ante*, at 18–19 ("Bard has pointed to direct evidence from the security footage demonstrating that COs Schadle and Dunning were alone with Goldson in his cell from 2:32 to 2:34 am . . . . Thus, the question for us to consider is not 'who?' or 'when?' but 'how?'"). This assertion is not supported by law. The lead opinion cites *Fazica v. Jordan*, 926 F.3d 283 (6th Cir. 2019), but that case is inapt. In *Fazica*, it was undisputed that corrections officers "twist[ed the plaintiff's] arm behind her back, rip[ped] her pants off, touch[ed] her genitals," and groped her breasts. *Id*. at 290. The officers' only defense was that the plaintiff could not identify which of the officers present in the room committed those terrible acts. *Id*. at 289–90. We held that the plaintiff's inability to do so was not fatal to her ability to survive summary judgment—*every* officer present was either liable because they committed the acts or liable because they failed to intervene. *Id*. at 292. But still, this "require[s] evidence that each particular defendant committed a specific constitutional violation." *Id*.

Bard presents no such evidence here. In fact, the only evidence about what happened when Defendants were in cell fifteen with Goldson shows they removed at least some restraints they placed on Goldson for transport, as well as loose items from the cell. (R. 76-1, Schadle Dep. at PageID # 3051–52, 3056; R. 75-5, Dunning Dep. at PageID # 2271–72, 2318.) No matter, say my colleagues, a rational jury could find that Schadle and Dunning caused Goldson's death when they were alone with him simply because Bard says so. An unsupported assertion such as this may suffice for a pass/fail law school exam, but it cannot be enough in federal court, where the plaintiff bears the burden of supporting her claims with affirmative evidence to survive summary judgment. *See Anderson*, 477 U.S. at 257.

Next, I do not believe that the perceived dispute about whether Goldson hung himself advances Bard's theory about Goldson's alleged self-strangulation. *Ante*, at 20. That's because summary judgment is appropriate unless there are disputes about *material* facts. *See* Fed. R. Civ. P. 56(a). Bard bears the burden of proof to establish that Defendants used excessive force leading to Goldson's death. So the material facts surrounding Goldson's cause of death concern whether Defendants are to blame. *See Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) ("A material fact is one that might affect the outcome of the suit under the governing law." (internal quotation marks omitted) (quoting *Anderson*, 477 U.S. at 248)). This standard is not akin to an employment discrimination case in which discrediting Defendants' proffered explanation is enough to assume wrongdoing. *See, e.g.*, *Miles v. S. Cent. Human Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020) ("If the plaintiff [shows that her employer's proffered reasons for firing her are pretextual], the factfinder may reasonably infer discrimination."). Rather, Bard must show there is a genuine dispute over her portrayal of the events—that Defendants caused Goldson's death. *Fazica*, 926 F.3d at 289 ("[T]o survive summary judgment, she must point to sufficient record evidence to create a disputed issue of material fact as to whether each individual officer was personally involved in the conduct that violated the plaintiff's constitutional rights." (internal quotation marks and alterations omitted) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 651 (6th Cir. 2010))). And she has not done so.

For the same reason, any dispute about whether Goldson was leg-shackled is also immaterial.**³** My colleagues conclude that whether Goldson's legs remained shackled is material because Bard claims that "it was by the manner of struggling with the leg shackles and neck collar that led to his death." *Ante*, at 26 (internal quotation marks omitted). But Bard presents no evidence that leg shackles cause asphyxiation. It's undisputed that Goldson died from asphyxiation. So Bard's claim hinges on whether she can show that Defendants did something to cause Goldson to asphyxiate. In short, it's irrelevant whether Goldson's legs were bound absent evidence of a restraint around his neck.

The only direct evidence my colleagues cite on whether Defendants caused Goldson's death is Dr. Varnau's testimony. But this evidence too cannot create a genuine dispute over the answer to that question. They say three statements by Varnau support Bard's theory of Goldson's death and create a dispute about whether Defendants caused it. *Ante*, at 21–22.

> First, she stated that Officer Don Hency commented on the autopsy photographs that he had knowledge of individuals incarcerated in the jail being "led around by hobble straps in the jail. Put the straps around their necks and they lead them like on dog leashes." Second, she confirmed that her statement that the marks may have been left from a hobble strap was based on observing photographs of Goldson's body. [Third,] Dr. Varnau [] testified that, based on her review of the evidence, Goldson's death was a homicide by strangulation.

*Ante*, at 21–22 (citations omitted). Finally, they note that "Dr. Varnau stated that Investigator Newman had reviewed autopsy photographs and concluded that the marks on Goldson's neck 'could be like a hobble strap or something like that.'" *Ante*, at 22 n.13 (quoting R. 74-15, Varnau Dep. at PageID # 1511.).

---

**³**And for what it's worth, I'm not sure the parties genuinely dispute whether Goldson's legs remained shackled. Only Dunning and Schadle's deposition testimony answers the question. Both testified that officers removed Goldson's leg shackles before leaving Goldson alone in cell fifteen. (R. 75-5, Dunning Dep. at PageID # 2271–72; R. 76-1, Schadle Dep. at PageID # 3051–53.) As the lead opinion concedes, the video footage is too blurry to identify the items that officers removed from cell fifteen. *Ante*, at 5. So instead, it faults Defendants for not proving they removed Goldson's leg shackles. *Ante*, at 37 ("The fact that the hallway video does not clearly show the officers removing the leg shackles from the cell supports the conclusion that they remained on Goldson."); *id.* ("It is true that . . . CO McKinzie 'stated clearly to the BCI that she saw the officers remove the leg shackles from holding cell 15 before locking Goldson in the cell,' but [because her later statements mention only the transport belt and handcuffs, these later statements] support the inference that she did not collect the leg shackles because they remained on Goldson's body." (internal quotation marks omitted)). But this inverts the burden of proof. *Bard* bears the burden of presenting affirmative evidence in support of her claims. *Anderson*, 477 U.S. at 257. Defendants don't have to prove anything. So it's improper to draw negative inferences from the lack of evidence they present.

A party opposing summary judgment must put forth evidence that "*will be* admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Because Varanu's statements are inadmissible at trial, they can't help Bard's claim survive summary judgment. The trial court ruled that Newman's testimony is inadmissible and Bard doesn't contest that. So as my colleagues concede, "Newman's testimony [i]s inadmissible, so we do not consider this statement by Varnau as supportive of Bard's opposition to summary judgment." *Ante*, at 22 n.13. And even though Officer Hency himself might be available to testify at trial—which would cure the hearsay problem—that testimony is irrelevant for another reason. Bard has pointed to no direct evidence that a hobble strap was present in the jail on the night of Goldson's death.

Instead, she, and my colleagues, use Hency's testimony to show that because Brown County corrections officers placed hobble straps around the necks of inmates in the past, they must have done so to Goldson too. But this "is the classic propensity argument that Rule 404(b) prohibits." *United States v. Blakely*, 375 F. App'x 565, 573 (6th Cir. 2010); *see Old Chief v. United States*, 519 U.S. 172, 180–81 (1997) ("[I]mproper grounds [to admit evidence] certainly include the one that Old Chief points to here: generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged[.]"). As this court made clear in *Blakely*, plaintiffs need not explicitly argue that a defendant had a particular, unsavory character trait to implicate Rule 404(b). Rather, that rule requires trial courts to exclude evidence when characterizing it as support for the argument that a defendant's prior acts establish that he must have done the same again later "is the only way that renders the information at all logically probative." *Blakely*, 375 F. App'x at 573; *see also Huddleston v. United States*, 485 U.S. 681, 685–86 (1988) (Rule 404(b) "generally prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character. . . . For instance [when] the jury may choose to punish the defendant for the similar rather than the charged act, or the jury may infer that the defendant is an evil person inclined to violate the law."). That's the case here. The only way that Hency's statement is relevant is if it's used to show that because Brown County corrections officers previously used hobble straps on other prisoners, they must've used one on Goldson.

My colleagues' response highlights a more fundamental problem with this evidence. As they concede: "Officer Hency's observation . . . does not pin the neck-leashing practice on any of the named defendants." *Ante*, at 21 n.12. So Rule 401 also bars this evidence. As the Supreme Court said in *Huddleston*, just because similar act evidence typically requires a low standard of proof, "[t]his is not to say, however, that [Plaintiffs] may parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo. . . . [S]imilar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." 485 U.S. at 689. Because Hency's statement is untethered to Defendants, it's inadmissible and doesn't support Bard's claim.

That leaves Varnau's second and third statements as the only remaining evidence Bard can use to support her claim. But these statements are problematic for their own reasons. Bard never asked the court to qualify Varnau as an expert. Nor could she. In her deposition, Dr. Varnau admits that (1) she is not, nor ever has been, a forensic pathologist, (2) she isn't qualified or certified to perform autopsies, and (3) she did not conduct autopsies during her service as Brown County Coroner, instead farming that responsibility out to the Montgomery County Coroner's office. (R. 74-15, Varnau Dep. at PageID # 1449, 1461.) So Varnau does not possess "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence[.]" Fed. R. Evid. 702(a). Instead, Varnau is a percipient witness. This means she can only testify to things "rationally based on [her] perception" and "not [make statements] based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

When a percipient witness is not present at the time of death, testimony about the cause of death is inadmissible. *Harrison v. N.Y. Life Ins. Co.*, 78 F.2d 421, 424 (6th Cir. 1935); *see Hall v. Flannery*, 840 F.3d 922, 927–28 (7th Cir. 2018) (holding that testimony expressing an opinion on cause of death from a witness not present at the time of death is admissible only if the witness is properly qualified under Rule 702 and *Daubert*). It's also well established that only experts can give opinion testimony on complex medical questions, such as whether self-strangulation by a hobble strap or hanging from a bed sheet caused ligature marks. *See In re*

*Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 227 F. Supp. 3d 452, 469–77 (D.S.C. 2017) (collecting cases from all fifty states and multiple federal courts that hold that expert testimony is required for issues that are medically complex). Varnau was not present when Goldson died. So her perception is limited to her postmortem observations of Goldson's body. Varnau's statement about Goldson's cause of death exceeds her role as a percipient witness and is inadmissible.[4]

But even if that testimony were admissible, "an inconsistent account of a deadly force encounter, when rendered by a person not physically present for the encounter, does not create a genuine dispute of fact." *Hicks v. Scott*, 958 F.3d 421, 437 n.2 (6th Cir. 2020). It's undisputed that Varnau was not physically present when Schadle and Dunning were with Goldson in cell fifteen. It's similarly undisputed that Varnau was not physically present when the jail staff first found Goldson dead. So Varnau's statements that a hobble strap may have been the cause of Goldson's asphyxiation and that Goldson died from strangulation—which conflict with the testimony of the officers who were present that they placed nothing around Goldson's neck and that he died from suicide by hanging—cannot create a genuine dispute on this issue. *See id.*

All that said, the biggest problem for Bard is that even if Varnau's testimony creates a genuine dispute about what caused the ligature marks on Goldson's neck and asphyxiated him, it still fails to show a dispute about whether Defendants placed that item around Goldson's neck. A § 1983 plaintiff must identify who committed the unconstitutional act. *Fazica*, 926 F.3d at 291 ("[For cases] in which the plaintiff lack[s] sufficient information to name responsible defendants or to offer an informed account of the facts, [] granting summary judgment to the

---

[4]My colleagues claim that Defendants never raised this argument and I'm addressing it sua sponte. But they note that the district court held that Defendants were entitled to summary judgment because "Plaintiff has not put forth *admissible* evidence establishing who caused Goldson's death and when if he did not commit suicide." *Ante*, at 18 (emphasis added and deleted) (quoting *Bard v. Brown County*, No. 1:15-CV-643, 2019 WL 590357, at *13 (S.D. Ohio Feb. 13, 2019)). And Defendants contested whether Bard put forth admissible evidence in support of her claim in the district court and again contest the same here. (Appellee's Br. at 20 ("Bard persists in citing material that cannot be presented in a form that would be admissible in evidence and is thus relegated from the summary judgment analysis." (internal quotation marks omitted); R. 108, Defs.' Reply in Supp. of Mot. for Summ. J. at PageID # 4489 ("Plaintiff heavily relies upon her pleadings and exhibits that are incapable of being presented in admissible form.")). What's more, Bard must point to evidence that "*will be* admissible at trial[.]" *Alexander*, 576 F.3d at 558. Just because the district court hasn't already excluded this evidence doesn't mean that it *will be* admissible at trial. *See ante*, at 34 ("[T]he district court may later decide to strike her testimony. . .").

defendants [is] appropriate." (internal quotation marks omitted) (quoting *Pershell v. Cook*, 430 F. App'x 410, 416 (6th Cir. 2011))). *Fazica* explained that a plaintiff's inability to identify which of a group of people committed an unconstitutional act does not alone entitle the defendants to summary judgment. *Id.* at 290. But still, a plaintiff must present "evidence that each particular defendant committed a specific constitutional violation." *Id.* at 292. Bard has not done that here. Neither Varnau's testimony, nor anything else in the record, shows that Defendants—or anyone besides Goldson himself—placed anything around Goldson's neck.

No problem, say my colleagues. "A jury could reasonably infer either that one or both of the officers strangled Goldson with a hobble strap or that one or both of them placed Goldson's neck in a hobble strap, which led him to strangle himself after struggling against the restraint." *Ante*, at 23. But that raises an even more fundamental question: on what evidence could a reasonable jury ground such an inference? Because I don't think Bard has satisfied her burden of putting forth that evidence, her claim fails.

## III.

Finally, Wedmore's comments, while ill-advised, are irrelevant. The lead opinion concedes he wasn't present in cell fifteen when Schadle and Dunning interacted with Goldson. *Ante*, at 28. Any alleged motive that a jury could attribute to Wedmore because of his comments is not transferable to Schadle and Dunning. *See NLRB v. SW General, Inc.*, 137 S. Ct. 929, 943 (2017) (holding, in the context of legislative history, that courts cannot impart the motives gleaned from one speaker's statements to other people the speaker is linked to); *Johnson v. Kroger Co.*, 319 F.3d 858, 868 (6th Cir. 2003) (noting, in the employment context, that statements by a non-decisionmaker suggesting a discriminatory intent cannot be used to attribute that discriminatory intent to the decisionmaker). So Wedmore's comments are in no way probative of whether Schadle and Dunning caused Goldson's death.

## IV.

All in all, Bard fails to support her allegations with affirmative evidence. So she cannot show a constitutional violation and Defendants are entitled to qualified immunity. Thus, I would affirm the district court's grant of summary judgment to Defendants on Bard's claim that they

used excessive force against Goldson by causing his death. And because Bard forfeited all her other claims, I would affirm the district court's grant of summary judgment to Defendants on those claims as well.

I respectfully dissent.